# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# CHARLESTON DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                                 CIVIL ACTION NO.  2:17-cv-01220

DAVID M. EATON, et al.,

               Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff the United States of America (the "Government") brings this action against Defendants David M. Eaton ("Mr. Eaton") and Lucinda L. Eaton ("Ms. Eaton") (collectively, the "Eatons") to collect the Eatons' unpaid tax liabilities and penalties from tax year 2006. (ECF No. 62.)[1] The Government also requests a determination that those liabilities are excepted from discharge in the Eatons' bankruptcy proceedings. (*Id.*) Before this Court is the Government's motion for summary judgment. (ECF No. 70.) For the reasons explained more fully herein, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.    BACKGROUND

The Eatons are former spouses who were married from 1998 until about 2015. (ECF No. 70-4 at 9; ECF No. 70-8 at 8.) In the early 2000s, while the Eatons were married, Mr. Eaton incorporated a cable installation company that contracted with

---

[1] The Government initially sought to collect the Eatons' unpaid tax liabilities for tax year 2008 as well. (ECF No. 62.) However, the Government represents that those liabilities have "since been completely paid" and that it "no longer seeks a judgment for any of the former liabilities for that year." (ECF No. 76 at 1 n.1.)

national cable companies to install lines and hired subcontractors to complete the work. (ECF No. 70-4 at 11–15, 79–80.) In 2005 and 2006, after Hurricane Katrina, Mr. Eaton's company contracted to install lines in Mississippi and Florida, which resulted in the company—and by extension, the Eatons—earning substantially more income than they had in previous years. (*Id.* at 20–21; ECF No. 70-8 at 15, 17–18, 46–47.) The Eatons' joint return for the 2006 tax year reported an adjusted gross income of $2,908,591 that year. (ECF No. 70-5.)

On April 29, 2006, the Eatons purchased a large home in Vienna, West Virginia, for $500,000. (ECF No. 70-9; *see* ECF No. 70-4 at 37.) Ms. Eaton wanted a smaller house, but she nonetheless "went along with" the purchase, although she was not involved in the negotiations. (ECF No. 70-8 at 28–29.) At some point, the Eatons discovered that the house had structural issues, so on May 30, 2006, they purchased another house nearby, which they planned to live in while they renovated the larger house, for $160,000. (ECF No. 70-11; *see* ECF No. 70-4 at 38–39, 46; ECF No. 70-8 at 31.) They also purchased a third house, which they used as a rental property and sold in 2009 or 2010. (ECF No. 70-4 at 47–48.) On May 24, 2010, the Eatons transferred ownership of the other two homes to Ms. Eaton's son. (ECF Nos. 70-16, 70-17.) According to Mr. Eaton, the Eatons intended to "sell the houses and pay the bills," specifically, the $1 million they owed in taxes. (ECF No. 70-4 at 55–58.) The homes were later transferred back to Mr. Eaton, and at least one of them was sold to pay the outstanding tax debt. (*Id.* at 45, 58.)

On September 18, 2006, the Eatons contracted with a construction company to remodel the large home, at an initial cost of $919,912.27. (ECF No. 70-10 at 1–2.) Ms. Eaton was not involved in choosing the contractor or making the plans for the renovation. (ECF No. 70-8 at 33.) She did not know how much Mr. Eaton agreed to pay the

contractor, and she signed the contract without reading it. (*Id.* at 32–33, 35.) Between September 18, 2006, and September 5, 2008, the Eatons paid $857,956.13 in cash installments to the contractor for the renovations. (ECF No. 70-10 at 5; *see* ECF No. 70-4 at 42–43.)

Around the same time, in 2006, Mr. Eaton, through a company incorporated in Ms. Eaton's name, purchased two fishing boats, for a total of around $600,000 in cash. (ECF No. 70-4 at 50, 52, 54–55.) The Eatons sold one of the boats on October 1, 2008, for $95,000 because "the motor had gone bad and things were going wrong with it." (ECF No. 70-4 at 51, 55; ECF No. 73.) According to Mr. Eaton, they sold the other boat on October 11, 2011, for around $100,000 because they "didn't have any money" to sue the contractor they hired to remodel their house. (ECF No. 70-4 at 51; ECF No. 70-14.) Ms. Eaton signed the bills of sale for each boat because she was asked to do so, but she did not know what the money from the sales was used for. (ECF No. 70-8 at 41, 45.)

On November 15, 2006, Mr. Eaton opened a personal investment account, which he funded with $100,000 cash. (ECF No. 70-4 at 59; ECF No. 70-15.) Ms. Eaton did not know about the investment account, and her name was not on the account. (ECF No. 70-8 at 55–56; ECF No. 70-15.) The money was in the account for "[a] few months" before Mr. Eaton withdrew it to invest in a beverage company. (ECF No. 70-4 at 60.) Mr. Eaton was approached by his accountant and asked to make an investment of $350,000 or $400,000 in a company that manufactured and distributed energy drinks. (ECF No. 70-4 at 22, 24–26.) In total, Mr. Eaton invested almost $1 million in the company, but the company was not successful, and he lost his entire investment. (*Id.* at 24, 28–29.) According to Mr. Eaton, if he had not spent the money, "it would have been used for the taxes." (*Id.* at 26.) Ms. Eaton told Mr. Eaton not to invest in the energy

drink company, and she did not know how much money he invested because he did not discuss it with her; he "just did it." (*Id.* at 27; ECF No. 70-8 at 20–21, 50–51, 63–64, 68.)

Mr. Eaton's cable installation business was negatively impacted by the financial crisis of the late 2000s, and the cable installation business effectively ceased operations. (ECF No. 70-4 at 69, 80.) In the meantime, Mr. Eaton was "working on the beverage company" until it went under. (*Id.* at 41.) For about six months in 2013, the Eatons managed a candy store that the owner "was trying to sell [them] on a payment plan." (*Id.* at 32.) Mr. Eaton made "some kind of deal" with the owner "to try it and see how it went." (ECF No. 70-8 at 24.) The Eatons planned to "buy him out" if the store "could be a viable business." (*Id.* at 26.) However, the store was not profitable, and the Eatons did not buy it. (*Id.*; ECF No. 70-4 at 32, 35.)

At some point between 2013 and 2015, Mr. Eaton was contacted by the Internal Revenue Service ("IRS") for nonpayment of taxes from the 2006 tax year. (ECF No. 70-4 at 62, 64.) The Eatons jointly filed their 2006 tax return on February 2, 2009, and it reflected $980,932 in taxes owed for that year. (ECF No. 70-5.) To date, the Eatons have paid nearly $45,000 toward the balance. (*See* ECF No. 70-6 at 3–4.) The Government brought this action on February 8, 2017, to collect the remainder. (ECF No. 1.) During the pendency of these proceedings, Mr. Eaton filed for Chapter 7 bankruptcy on August 2, 2018, and received a discharge on December 11, 2018. (*See* ECF No. 43.) Ms. Eaton filed for Chapter 7 bankruptcy on May 30, 2019, and received a discharge on October 25, 2019. (*See* ECF No. 53.)

The Government filed its motion for summary judgment on February 14, 2020. (ECF No. 70.) Neither Mr. Eaton nor Ms. Eaton responded to the motion. On March

25, 2020, the Government filed a supplemental memorandum in support of its motion for summary judgment (ECF No. 76), to which Ms. Eaton timely responded on April 7, 2020 (ECF No. 78). As such, the Government's motion for summary judgment is ready for resolution.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). However, where, as here, the nonmoving party does not respond to the motion, this Court must nonetheless "review the motion . . . and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993); *Pa. Higher Educ. Assistance Agency v. Hoh*, No. 2:14-cv-00748, 2016 WL 815287, at *5 (S.D.W. Va. Feb. 29, 2016) ("A party's

failure to respond to a motion for summary judgment, in and of itself, does not show that the moving party is entitled to judgment as a matter of law." (citing *Custer*, 12 F.3d at 416)). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

### III. ANALYSIS

*A. The Eatons have unpaid federal income tax liabilities from the 2006 tax year.*

If, as here, a taxpayer fails to satisfy his obligation to pay taxes to the Government, the Government "may seek to collect [the] unpaid obligation[] via its common-law right to sue on a debt." *United States v. Sarubin*, 507 F.3d 811, 815 (4th Cir. 2007) (citing *Milwaukee Cty. v. M.E. White Co.*, 296 U.S. 268, 271 (1926)). "In a tax collection action, the Government can establish a *prima facie* case in support of tax liability by showing that an assessment has been made against [the] defendant." *United States v. Register*, 717 F. Supp. 2d 517, 522 (E.D. Va. 2010) (citing *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002)). "An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes," and it "is entitled to a legal presumption of correctness." *Fior D'Italia, Inc.*, 536 U.S. at 242.

Here, the Government offers an account transcript reflecting the Eatons' tax liabilities, as of February 10, 2020, for the tax period ending December 31, 2006, in addition to a declaration from an IRS revenue officer verifying that the account transcript is authentic. (ECF No. 70-6.) The revenue officer further represented that as of that date,[2] the Eatons "owe $1,497,147.58 for the 2006 tax year," an amount that "includes

---

2 The declaration inadvertently gives the date as February 10, 2010. (*Compare* ECF No. 70-6 at 2, *with*

6

the assessed tax liabilities, interest on the assessments, and any payments the Eatons have made toward those amounts." (*Id.*)  This information sufficiently establishes that the Eatons "failed to make [their] required federal tax payments" for the 2006 tax year, as well as the amount of their current liability.  *See United States v. Shifflett*, No. 5:15-cv-00062, 2016 WL 1562988, at *2 (W.D. Va. Apr. 18, 2016); *United States v. Parr*, No. 3:10-cv-00061, 2011 WL 4737066, at *2 (W.D. Va. Oct. 6, 2011).

Once the Government demonstrates that there are assessed tax liabilities, "the burden then shifts to the taxpayer to provide sufficient evidence to persuade the Court the IRS's determinations are incorrect."  *United States v. Lovely*, No. 1:18-cv-102, 2019 WL 4739863, at *4 (M.D.N.C. Sept. 27, 2019) (internal quotation marks omitted); *see United States v. Pomponio*, 635 F.2d 293, 297 n.4 (4th Cir. 1980) (explaining that taxpayer must "introduce[] evidence sufficient to support a finding that the assessment is wrong" (quoting *Higginbotham v. United States*, 556 F.2d 1173, 1176 (4th Cir. 1977))).  The taxpayer "must also establish the correct amount, if any, of taxes due."  *United States v. Akins*, No. 1:16-cv-00084-JMC, 2018 WL 2045546, at *1 (D. Md. May 2, 2018).

Here, Mr. Eaton admits that he "owed the IRS $1 million."  (ECF No. 70-4 at 56; *see id.* at 80.)  He also agreed that his income in 2006 was $2,908,591, as reflected on his return for that tax year.  (*Id.* at 67; *see* ECF No. 70-5.)  Ms. Eaton, on the other hand, claims that she never discussed the taxes with Mr. Eaton and that she did not know that he made nearly $3 million in 2006, or that the Eatons owed nearly $1 million in taxes for that year.  (ECF No. 70-8 at 62–63.)  But when, as here, "taxpayers file a joint income tax return, they are jointly and severally liable for the amount of tax or any deficiency due."  *Grossman v. Comm'r*, 182 F.3d 275, 278 (4th Cir. 1999); *see* I.R.C. § 6013(d)(3)

---

ECF No. 71 at 8.)

("[I]f a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."). Ms. Eaton does not contend that the "innocent spouse" exception to this joint-and-several liability applies in this case. (ECF No. 78.) *See* I.R.C. § 6015; *Grossman*, 182 F.3d at 279 ("The taxpayer . . . carries the burden of proving that he falls within the terms of any innocent spouse provision." (citing *Ratana v. Comm'r*, 662 F.2d 220, 224 (4th Cir. 1981))). She also does not challenge the amount of the Government's assessment. (ECF No. 78.)

Accordingly, the Government has shown that the Eatons have unpaid tax liabilities from the 2006 tax year, which as of February 10, 2020, totaled $1,497,147.58, inclusive of interest.[3]

> B. *Those liabilities are exempted from discharge in Mr. Eaton's bankruptcy proceedings, but an issue of fact remains as to whether they are exempted from discharge in Ms. Eaton's bankruptcy proceedings.*

"A discharge in bankruptcy generally prevents a creditor from pursuing pre-bankruptcy debts against a debtor." In re *Moland*, 609 B.R. 467, 472 (Bankr. D.S.C. 2018). But, as relevant here, a debtor's federal tax debt is excepted from discharge if "the debtor . . . willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). This exception "is designed to police debtors' bad faith conduct." In re *Moroney*, 352 F.3d 902, 907 (4th Cir. 2003). The Government bears the burden to show that the exception applies. *United States v. Clayton*, 468 B.R. 763, 769–70 (M.D.N.C. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)).

---

3 "[T]he amount of interest accrued on . . . tax liability is a matter of law." *Sarubin*, 507 F.3d at 816 (emphasis deleted). Interest continues to accrue until the tax liability is paid. I.R.C. § 6601(a).

"[T]he willful evasion of tax debts under § 523(a)(1)(C) encompasses 'both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully').'" In re *Conard*, No. 14-10093, 2017 WL 6403065, at *4 (Bankr. E.D. Va. Dec. 14, 2017) (quoting *Clayton*, 468 B.R. at 770). "A debtor's mere failure to pay his taxes is not sufficient to establish that he has attempted to evade or defeat his taxes; however, when considered in the totality of the circumstances, nonpayment is relevant." *Id.* (citing *Clayton*, 468 B.R. at 770). More specifically, a debtor's nonpayment of his tax liabilities "coupled with" certain "acts or omissions [that] took place either during the tax year(s) in which the debtor failed to pay or during later years while the tax obligation remained due" may satisfy § 523(a)(1)(C)'s conduct requirement. *Clayton*, 468 B.R. at 770. A debtor's "failure to file timely returns," "concealment of assets," "inadequate recordkeeping, intra-family transfers for insufficient consideration, transfers made in the face of serious financial difficulties, and . . . lavish or extravagant lifestyle" have all been found sufficient. *Id.*

And to demonstrate § 523(a)(1)(C)'s mental status requirement, "the Government must prove that the debtor '(1) had a duty to file income tax returns and pay taxes; (2) knew that he had such a duty; and (3) voluntarily and intentionally violated that duty.'" *Id.* at 771 (quoting *United States v. Fretz*, 244 F.3d 1323, 1330 (11th Cir. 2001)); *see United States v. Coney*, 689 F.3d 365, 374 (5th Cir. 2012); In re *Gardner*, 360 F.3d 551, 558 (6th Cir. 2004); In re *Fegeley*, 118 F.3d 979, 984 (3d Cir. 1997); In re *Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996). To that end, "[t]he Government need only demonstrate that the debtor's actions were willful—not that he acted with fraudulent intent." *Clayton*, 468 B.R. at 771 (citing *Fegeley*, 118 F.3d at 984). *But see Hawkins v. Franchise*

9

*Tax Bd. of Calif.*, 769 F.3d 662, 669 (9th Cir. 2014) ("[D]eclaring a tax debt nondischargeable under 11 U.S.C. § 523(a)(1)(C) on the basis that the debtor 'willfully attempted in any manner to evade or defeat such tax' requires a showing of specific intent to evade the tax.").

Both elements of § 523(a)(1)(C) are met as to Mr. Eaton. He admits that he knew of the Eatons' obligation to pay taxes for the 2006 tax year. (ECF No. 70-4 at 71.) And he acknowledges that he invested the funds that ultimately would have been used to satisfy the tax obligation—about $1 million—in a beverage company that eventually failed and gave him no return on his investment. (*Id.* at 26.) He also put $100,000 cash into a personal investment account, although he withdrew the money a few months later and invested it in the energy drink company. (*Id.* at 59–60; ECF No. 70-15.) In addition, the Eatons purchased three homes, at a cost of nearly $750,000, and paid a contractor more than $850,000 to renovate one of those homes. (*Id.* at 37–39, 42–43, 47–48; ECF No. 70-9; ECF No. 70-10; ECF No. 70-11.) And they bought two boats, for a total of around $600,000. (ECF No. 70-4 at 50, 52, 54–55.) Mr. Eaton's significant spending on non-essential matters during a time when he knew he had an obligation to pay income taxes but did not do so demonstrates that Mr. Eaton "willfully . . . evade[d]" his taxes, and the tax debt is not dischargeable according to § 523(a)(1)(C). *See Conard*, 2017 WL 6403065, at *6 ("The record is uncontroverted that his knowledge of his obligation to pay his income taxes, his failure to do so and his conscious and willful decision to expend available funds on discretionary items occurred during and subsequent to . . . the tax years under consideration." (citing *Gardner*, 360 F.3d at 560–61)).

But when determining whether a federal tax debt is non-dischargeable pursuant to § 523(a)(1)(C), this Court "must . . . view each . . . [d]ebtor[] individually." In re *Brown*,

Nos. 09-br-22961, 10-ap-2181, 2012 WL 1970249, at *7 (Bankr. D. Utah May 31, 2012); *see* In re *Lacheen*, 365 B.R. 475, 488–89 (Bankr. E.D. Pa. 2007); In re *Binkley*, 242 B.R. 728, 733 (Bankr. M.D. Fla. 1999) ("[A] fraudulent return does not preclude dischargeability as to a spouse who is not shown to have been guilty of complicity or otherwise personally involved in the fraud."). "There is no vicarious or presumed liability under § 523(a)(1)(C) simply because the [d]ebtors are married and filed joint returns, and the [Government] must separately meet its burden on the conduct and mental state elements as to both [spouses]." *Brown*, 2012 WL 1970249, at *7 (citing *Birkenstock*, 87 F.3d at 953; In re *Blaker*, 205 B.R. 326, 328 (Bankr. M.D. Fla. 1996)); In re *Sly*, 305 B.R. 72, 83 (Bankr. N.D. Fla. 2003) (citing In re *Kirk*, 98 B.R. 51, 54 (Bankr. M.D. Fla. 1989)). The Government has not met that burden as to Ms. Eaton.

The Government's arguments as to willfulness largely detail conduct in which the Eatons purportedly engaged jointly or Mr. Eaton's conduct, without specific reference to Ms. Eaton. (*See* ECF No. 71 at 10–11; ECF No. 76 at 4–5.) But Ms. Eaton represents that Mr. Eaton "pretty much did what [he] wanted to do" while she "took care of [their] daughter and made sure that she was growing up well." (ECF No. 70-8 at 49; *see* ECF No. 78 at 1.) She states that she did not know how much Mr. Eaton's cable installation company earned in 2006. (ECF No. 70-8 at 60, 63.) And she represents that she was never involved in preparing or filing the Eatons' taxes during their marriage, nor did she discuss the 2006 taxes with Mr. Eaton. (*Id.* at 57, 63.) Importantly, she did not know if the taxes were paid or not. (*Id.* at 63.) Her understanding was that Mr. Eaton hired a "tax firm" to handle the cable installation company's accounting and taxes. (*Id.* at 57, 60; *see* ECF No. 78 at 1.) She stated that she did not find out about the Eatons' tax issues until 2012. (*Id.* at 65.)

11

Based on the evidence the Government has supplied, at the earliest, Ms. Eaton was aware of the Eatons' tax obligations in February 2009, when she signed the joint return for tax year 2006. (ECF No. 70-5.) *See United States v. Coney*, 689 F.3d 365, 377 (5th Cir. 2012) (finding that wife's "signature on the [joint] returns confirms her knowledge of her duty to pay the relevant taxes" because the returns "expressly indicated the couple's outstanding tax liabilities"); In re *Barto*, 564 B.R. 87, 95 (Bankr. N.D. Ga. 2016) (citing *Coney*, 689 F.3d at 377). *But see Birkenstock*, 87 F.3d at 953 (stating that wife's signature on joint tax return "is evidence that she had a legal tax duty; it is not necessarily evidence that she knew of that duty, nor that she deliberately sought to evade it"). There is simply no evidence that Ms. Eaton knew before that time that her legal duty to file a tax return and pay taxes for the 2006 tax year was unsatisfied,[4] and her general awareness that the Eatons were earning more money in 2006 than in previous years is not equivalent to her knowledge of their duty to pay a particular tax debt. *See Lacheen*, 365 B.R. at 489 (stating that wife "had no reason in 1995 based on [husband's] assurances and the spike

---

4 The Government also argues that Ms. Eaton was "grossly negligent" by "fail[ing] to ascertain or pay her federal income tax liabilities." (ECF No. 76 at 3–6.) But gross negligence is less than willfulness: "[a] debtor's actions are willful if his actions [or omissions] are 'voluntary, conscious, and intentional.'" *Clayton*, 468 B.R. at 771 (quoting In re *Toti*, 24 F.3d 806, 809 (6th Cir. 1994)). The Government has provided no case law from any jurisdiction, and this Court has found none, applying a "gross negligence" standard to demonstrate willfulness in a non-dischargeability proceeding under 11 U.S.C. § 523(a)(1)(C). (*See* ECF No. 76 at 4.) In fact, the case law suggests that a wife who does not herself have income or otherwise participate in the family's financial dealings has no affirmative duty to ascertain whether the family's tax obligations are satisfied in order for a tax debt to be deemed dischargeable. *See Birkenstock*, 87 F.3d at 953 (concluding that wife's tax liabilities dischargeable where she "has never held a job outside the home and . . . does not take an active role in her family's financial or estate planning because she considers such matters not her responsibility"); *Brown*, 2012 WL 1970249, at *9 (holding that wife's tax liabilities dischargeable because husband "controlled the family's finances," wife "had essentially no independent income during the relevant years," and "had no substantial involvement" in transactions government used as examples of willful conduct); *Sly*, 305 B.R. at 83 (determining that wife's tax liabilities dischargeable because she "was not a sophisticated businesswoman" and "spent most of her time" volunteering and raising family, even though she was aware that business was source of family's income and paid bills on family's behalf). *But see Lacheen*, 365 B.R. at 489–90 (holding that tax liabilities not dischargeable as to wife who "maintained a purposeful ignorance of the financial realities where there were red flags that should have alerted her to the problem").

12

in income that he experienced to suspect that he would not be able to pay the taxes . . . when they came due").

February 2009 is, of course, several years after the Eatons' purchase of their houses and boats and their entry into the renovation contract for their large home. There is nothing to indicate that Ms. Eaton knew at the time of this spending that the Eatons had unpaid tax obligations. As such, this conduct fails to establish that Ms. Eaton "willfully . . . evade[d]" those obligations, as to render them non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C). However, the Government also points to the Eatons' May 24, 2010 transfer of ownership of their homes to Ms. Eaton's son as an effort "to remove assets from the IRS's reach." (ECF No. 76 at 3.) Ms. Eaton states that Mr. Eaton "came to [her] and said he wanted to put the house in [her] son's name . . . in case anything happened to [the Eatons]." (ECF No. 78 at 1.) She further represents that she "was not aware of anything going on with taxes" at that time. (*Id.* at 2.) Given Ms. Eaton's prior testimony that Mr. Eaton took charge of the family's financial matters without her involvement, there remains an issue of fact as to whether Ms. Eaton "willfully attempted . . . to evade or defeat" the Eatons' tax liabilities by transferring their homes to her son. 11 U.S.C. § 523(a)(1)(C).

In sum, the Eatons' tax liabilities are not dischargeable under 11 U.S.C. § 523(a)(1)(C) as to Mr. Eaton, but there is a question of fact as to whether those liabilities are dischargeable as to Ms. Eaton.

### IV. CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment (ECF No. 70) is **GRANTED IN PART** and **DENIED IN PART**. By separate order, this Court will set this matter for trial and schedule other deadlines.

**IT IS SO ORDERED**.

The Clerk is **DIRECTED** to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: April 17, 2020

Dwane L. Tinsley
United States Magistrate Judge