**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.            CIVIL ACTION NO. 2:17-cv-01220

LUCINDA L. EATON,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

   This matter is before this Court following a bench trial held on May 22, 2020, as to the issue of whether Defendant Lucinda L. Eaton's ("Ms. Eaton") federal tax liabilities for tax year 2006 are excepted from discharge in her bankruptcy proceedings pursuant to 11 U.S.C. § 523(a)(1)(C). (*See* ECF No. 79 at 11–13.) For the reasons explained more fully herein, this Court **FINDS** that they are not so excepted.

*I.*  *FINDINGS OF FACT*

   This Court has considered the following facts, which were adduced at trial, in addition to the undisputed facts that are summarized in this Court's Memorandum Opinion and Order granting in part and denying in part the motion for summary judgment filed by Plaintiff the United States of America ("the Government") (ECF No. 79 at 1–4) and will not be repeated here.

   At the time Ms. Eaton and Defendant David M. Eaton ("Mr. Eaton") (collectively, the "Eatons") married in 1998, Mr. Eaton worked as a cable installer for someone else's company. Ms. Eaton had been employed in medical billing up until then, but she did not work outside the home during the Eatons' marriage. Around 2001, Mr. Eaton started his

own cable installation business, and the Eatons lived in California over the next several years. In 2004, Mr. Eaton established Westnet, Inc. ("Westnet"), a Nevada corporation for which Ms. Eaton is listed as the president, secretary, treasurer, and sole director. Ms. Eaton knew that Westnet was formed "in her name." However, aside from signing documents Mr. Eaton presented to her, she never did any work as an officer or director of Westnet.

The Eatons lived modestly until around 2005, when Hurricane Katrina prompted a significant expansion of Mr. Eaton's cable installation business in Texas and Mississippi. Mr. Eaton traveled between their home and the worksites, and although Ms. Eaton and their daughter went with him a couple times, she largely remained at home. Ms. Eaton noticed that Mr. Eaton's business was doing better and that they had more money, but she was not aware of how much income they had during that time. While the Eatons had a joint bank account that Mr. Eaton set up, Ms. Eaton did not review the statements. Mr. Eaton paid their bills and otherwise managed their finances during their marriage. If Ms. Eaton asked Mr. Eaton about financial matters, he would tell her not to worry because he was taking care of it.

In April and May 2006, the Eatons purchased two homes in Vienna, West Virginia, for a total of more than half a million dollars in cash. In September 2006, they entered into a nearly $1 million contract to renovate one of the homes. Ms. Eaton was involved in choosing some of the fixtures and décor. They also paid cash for two boats, which were titled to Westnet, that year. The boats were docked in Fort Lauderdale, Florida, where the Eatons lived for a short time while Mr. Eaton had work there.

In November 2006, the Eatons untimely filed their tax return for the 2005 tax year. The return was prepared by an accounting firm and reported an adjusted gross income of

$210,791, and $43,881 in taxes owed. The Eatons paid that amount in full with their return. They later filed an amended joint return for the 2005 tax year on February 19, 2008, that reported an adjusted gross income of $873,910 for that year. On April 14, 2008, the Internal Revenue Service ("IRS") assessed additional taxes for the 2005 tax year in the amount of $241,231. The Eatons made no payment toward the balance due. The IRS sent automated notices of the amount owed to the Eatons' last known address[1] on April 14 and September 22, 2008.

On October 1, 2008, Ms. Eaton, as president of Westnet, signed a document authorizing Westnet to sell one of the Eatons' boats for $95,000. She did not draft the document, nor did she read it before signing it. She signed the document and the bill of sale for the boat because Mr. Eaton asked her to do so. She was not present at the closing, and a friend of Mr. Eaton's signed in her place on the closing documents.

Also in 2008, the Eatons sued the contractor they hired to renovate their home in September 2006 because Mr. Eaton was unhappy with the contractor's work and felt that the renovation took too long to complete. The IRS was added to the suit as an interested party because the Eatons had outstanding federal tax debt.

The Eatons untimely filed their joint return for the 2006 tax year in February 2009. Ms. Eaton reviewed the return before signing it but did not ask why it was being filed so late. Like their return for the 2005 tax year, the Eatons' return for the 2006 tax year was prepared by an accounting firm. They reported an adjusted gross income of $2,908,591, and total tax due of $980,446, but they made a payment of only $25,000 when they submitted the return to the IRS. On May 4, 2009, the IRS sent an automated notice to

---

[1] All of the automated notices from the IRS were sent to the Eatons' last known address based on the IRS's records; however, it is not known to which address the notices were sent.

3

the Eatons' last known address informing them of the amount owed. The IRS sent similar automated notices on September 27, 2010, and September 26, 2011.

On May 24, 2010, the Eatons transferred ownership of their homes to Ms. Eaton's son for no consideration. Ms. Eaton signed only one of the deeds. At the time, she understood that they were placing their larger house in her son's name so that he would have a place to live and could care for the Eatons' daughter if something happened to them.

The Eatons, through Westnet, sold their other boat on October 11, 2011. Ms. Eaton signed the bill of sale, but someone else wrote "President" after her name. Like the sale of the first boat in October 2008, Mr. Eaton organized the sale and asked Ms. Eaton to sign documents, which she did. Ms. Eaton did not know the sale price of the boat, nor did she ask how the money from the sale would be used. The IRS did not receive any of the proceeds.

In May 2012, the IRS attempted to place a lien on the Eatons' assets due to their federal tax debt. On December 7, 2012, the IRS sent Ms. Eaton a notice of its intent to file a lien, which was sent via certified mail to a post office box in Vienna, West Virginia. Ms. Eaton never maintained a post office box for receiving her mail, and Mr. Eaton signed the certified mail receipt on her behalf. On December 19, 2012, Mr. Eaton completed a request for hearing form, which listed the Eatons' address as that same post office box, and signed Ms. Eaton's name on it. Mr. Eaton attended a hearing on March 18, 2013, without telling Ms. Eaton about it.

That same day, Ms. Eaton's son entered into a contract to sell the Eatons' larger home for $910,000. On April 18, 2013, the IRS secured liens against the interests of the Eatons and Ms. Eaton's son in the property. A week later, Mr. Eaton completed an offer

4

in compromise form and offered the IRS a lump sum payment of $600,500 from the sale of the house to settle the outstanding tax debts. Mr. Eaton signed Ms. Eaton's name on the offer in compromise and did not tell her about it. They were separated at that time. The offer in compromise was rejected because it did not satisfy the full amount of the tax debt and Mr. Eaton requested to keep some of the proceeds from the sale for personal use. The Eatons also had not timely filed their return for the 2011 tax year. The IRS revenue officer felt that the offer in compromise was an attempt to delay or avoid collection of the taxes. The IRS personnel who handled the Eatons' account spoke only with Mr. Eaton until September 20, 2013, when the revenue officer spoke with Ms. Eaton.

Eventually, the Eatons' assets were sold, and because of the federal tax liens, the proceeds were used to partially satisfy the unpaid tax debt. The Eatons made no other voluntary payments toward that debt. The Government eventually brought this action to collect the remaining amount. During the pendency of this action, Ms. Eaton filed for Chapter 7 bankruptcy and received a general discharge.

## II. ANALYSIS

At issue is whether Ms. Eaton's federal tax liabilities for tax year 2006 are excepted from discharge in her bankruptcy proceedings pursuant to 11 U.S.C. § 523(a)(1)(C). "A discharge in bankruptcy generally prevents a creditor from pursuing pre-bankruptcy debts against a debtor." In re *Moland*, 609 B.R. 467, 472 (Bankr. D.S.C. 2018). But, as relevant here, a debtor's federal tax debt is excepted from discharge if "the debtor . . . willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). This exception "is designed to police debtors' bad faith conduct." In re *Moroney*, 352 F.3d 902, 907 (4th Cir. 2003). The Government bears the burden to show, by a preponderance of the evidence, that the exception applies. *United States v. Clayton*, 468

5

B.R. 763, 769–70 (M.D.N.C. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)). Where, as here, a joint return is filed, the Government must meet that burden separately as to each spouse. In re *Brown*, Nos. 09-br-22961, 10-ap-2181, 2012 WL 1970249, at *7 (Bankr. D. Utah May 31, 2012) (citing In re *Birkenstock*, 87 F.3d 947, 953 (7th Cir. 1996); In re *Blaker*, 205 B.R. 326, 328 (Bankr. M.D. Fla. 1996)); In re *Sly*, 305 B.R. 72, 83 (Bankr. N.D. Fla. 2003) (citing In re *Kirk*, 98 B.R. 51, 54 (Bankr. M.D. Fla. 1989)).

"[T]he willful evasion of tax debts under § 523(a)(1)(C) encompasses 'both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully').'" In re *Conard*, No. 14-10093, 2017 WL 6403065, at *4 (Bankr. E.D. Va. Dec. 14, 2017) (quoting *Clayton*, 468 B.R. at 770). "A debtor's mere failure to pay his taxes is not sufficient to establish that he has attempted to evade or defeat his taxes; however, when considered in the totality of the circumstances, nonpayment is relevant." *Id.* (citing *Clayton*, 468 B.R. at 770). More specifically, a debtor's nonpayment of his tax liabilities "coupled with" certain "acts or omissions [that] took place either during the tax year(s) in which the debtor failed to pay or during later years while the tax obligation remained due" may satisfy § 523(a)(1)(C)'s conduct requirement. *Clayton*, 468 B.R. at 770. A debtor's "failure to file timely returns," "concealment of assets," "inadequate recordkeeping, intra-family transfers for insufficient consideration, transfers made in the face of serious financial difficulties, and . . . lavish or extravagant lifestyle" have all been found sufficient. *Id.*

And to demonstrate § 523(a)(1)(C)'s mental status requirement, "the Government must prove that the debtor '(1) had a duty to file income tax returns and pay taxes; (2)

knew that he had such a duty; and (3) voluntarily and intentionally violated that duty.'" *Id.* at 771 (quoting *United States v. Fretz*, 244 F.3d 1323, 1330 (11th Cir. 2001)); *see United States v. Coney*, 689 F.3d 365, 374 (5th Cir. 2012); In re *Gardner*, 360 F.3d 551, 558 (6th Cir. 2004); In re *Fegeley*, 118 F.3d 979, 984 (3d Cir. 1997); In re *Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996). To that end, "[t]he Government need only demonstrate that the debtor's actions were willful—not that he acted with fraudulent intent." *Clayton*, 468 B.R. at 771 (citing *Fegeley*, 118 F.3d at 984). *But see Hawkins v. Franchise Tax Bd. of Calif.*, 769 F.3d 662, 669 (9th Cir. 2014) ("[D]eclaring a tax debt nondischargeable under 11 U.S.C. § 523(a)(1)(C) on the basis that the debtor 'willfully attempted in any manner to evade or defeat such tax' requires a showing of specific intent to evade the tax.").

The Government has not demonstrated that after Ms. Eaton discovered the Eatons' 2006 taxes remained unpaid, she intentionally engaged in any conduct inconsistent with her duty to pay those taxes. The evidence presented in this case to date indicates that during their marriage, Mr. Eaton preferred that Ms. Eaton take care of the home, while he handled their finances without her input. Mr. Eaton's work was the sole source of their income during that time, and he largely did what he wanted with their money. The Government points out that Ms. Eaton knew that the Eatons' income significantly increased in 2005 and 2006 and that she was aware that they purchased two homes and two boats around that time and hired a contractor to renovate one of the homes. Ms. Eaton also testified that she understood the Eatons' obligation to pay taxes and that the amount owed would grow with increased income. But her general awareness that they were earning and spending more money is not evidence that she anticipated that their taxes would not be paid. *See* In re *Lacheen*, 365 B.R. 475, 489 (Bankr. E.D. Pa. 2007)

7

(stating that wife "had no reason in 1995 based on [husband's] assurances and the spike in income that he experienced to suspect that he would not be able to pay the taxes . . . when they came due"). There is simply no evidence to suggest that Ms. Eaton knew that the Eatons' taxes were not paid at the time of that spending—indeed, albeit late, they paid the full amount owed on the 2005 tax return prepared by their accountant in November 2006, and their 2006 tax return was not yet due. And the Government does not assert that the Eatons had a pattern of failing to timely pay their taxes before that time, which would perhaps alert Ms. Eaton that she needed to be more conscientious in ensuring their tax liabilities were satisfied. *See id.* at 489–90 (holding that tax liabilities not dischargeable as to wife who "maintained a purposeful ignorance of the financial realities where there were red flags that should have alerted her to the problem").

The Government argues that Ms. Eaton should have known that the Eatons were experiencing financial difficulties in 2008, when they submitted an amended 2005 tax return showing that they underreported their 2005 income by more than $600,000.[2] They also sued the contractor they had hired to renovate one of their homes, and the contractor countersued them and placed a mechanic's lien on their property. And Ms. Eaton, as Westnet's president, authorized the sale of one of the Eatons' boats in October 2008. But neither selling a boat nor filing a lawsuit—or being countersued—inherently suggests that Ms. Eaton would have been put on notice that the Eatons were unable to, and did not, pay their taxes. In other words, none of this conduct indicates that Ms. Eaton intentionally violated her duty to pay.

The evidence shows that at the earliest, Ms. Eaton had knowledge of the Eatons' 2006 tax liabilities in February 2009, when she reviewed and signed their joint return for

---

2 The amended tax return is not in the record before this Court.

8

the 2006 tax year. *See Coney*, 689 F.3d at 377 (finding that wife's "signature on the [joint] returns confirms her knowledge of her duty to pay the relevant taxes" because the returns "expressly indicated the couple's outstanding tax liabilities"); *United States v. Williams*, 489 F. App'x 655, 659 (4th Cir. 2012) ("A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." (quoting *Greer v. Commissioner*, 595 F.3d 338, 347 n.4 (6th Cir. 2010))). But as she testified at trial, she had no reason to believe at the time that the taxes would not be paid. She did not know then that Mr. Eaton invested and lost nearly $1 million in a failed beverage company, and there is no evidence before this Court of a modification of the Eatons' lifestyle or any other changes that would indicate to Ms. Eaton that they were suffering financially.

The Government demonstrated that the IRS sent the Eatons, at their last known address, various automated notices of their nonpayment in 2010 and 2011. But the notices were not sent via certified mail, and there is absolutely no evidence before this Court that Ms. Eaton received them. In fact, the evidence suggests that Mr. Eaton attempted to hide the Eatons' tax problems from Ms. Eaton: an IRS notice sent by certified mail to Ms. Eaton was sent to a post office box that Ms. Eaton did not know about and never used to receive mail, and the certified mail receipt was signed by Mr. Eaton. Mr. Eaton also listed the post office box as the Eatons' address on the request for hearing and offer in compromise forms he completed without Ms. Eaton's knowledge and sent to the IRS in 2012 and 2013. Mr. Eaton has maintained throughout these proceedings, as he testified at trial, that he was trying to deal with the situation on his own and not involve Ms. Eaton. This is supported by the fact that IRS personnel had no contact with Ms.

9

Eaton until September 2013, despite pursuing the Eatons as early as 2008 over their unpaid taxes.

Given Mr. Eaton's apparent efforts to conceal their financial problems from Ms. Eaton, it is unlikely that she knew of their unsatisfied tax debt when she agreed to transfer their homes to her son in May 2010. She credibly testified at trial that Mr. Eaton told her they needed to ensure that their daughter would be cared for in the event they were unable to do so and that Ms. Eaton's son would have a place to live. For someone such as Ms. Eaton who spent her marriage caring for her children, that reasoning seems more plausible to justify conveying their home than a conscious attempt to avoid paying taxes. And while the Government made much of Ms. Eaton's supposed affinity for the boat the Eatons sold in October 2011, there is nothing to suggest that she signed the necessary paperwork as Westnet's president with the knowledge that the Eatons had significant tax liabilities at that time.

In sum, the Government has presented documents with Ms. Eaton's name on them, but little in the way of decisive behavior showing that she knew the Eatons had not paid their taxes for the 2006 tax year and acted contrary to that duty. Much of the conduct the Government seeks to attribute to Ms. Eaton was undertaken either through Mr. Eaton or at his direction during a time when the evidence suggests he was actively attempting to cover up their financial situation. Therefore, Ms. Eaton did not act with the requisite mental state to have "willfully attempted in any manner to evade or defeat" payment of the Eatons' 2006 taxes. 11 U.S.C. § 523(a)(1)(C); *see Clayton*, 468 B.R. at 771 (stating that to satisfy mental state element of § 523(a)(1)(C), government must show that taxpayer had knowledge of duty to pay taxes and "voluntarily and intentionally violated

10

that duty" (quoting *Fretz*, 244 F.3d at 1330)); *see also Moroney*, 352 F.3d at 907 (stating that § 523(a)(1)(C) aimed at "debtors' bad faith conduct").

### III. CONCLUSION

For the foregoing reasons, this Court **FINDS** that Ms. Eaton's federal tax liabilities for tax year 2006 were fully discharged in her bankruptcy proceedings.

**IT IS SO ORDERED**.

The Clerk is **DIRECTED** to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: May 28, 2020

Dwane L. Tinsley
United States Magistrate Judge